

FILED

May 14 2026, 9:01 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court


I N T H E

# Court of Appeals of Indiana

Erie Insurance Exchange,

*Appellant / Cross-Appellee-Defendant*

v.

Christine Cosme and Roy Cosme,

*Appellees / Cross-Appellants-Plaintiffs*

---

May 14, 2026

Court of Appeals Case No.
25A-CT-1439

Appeal from the Lake Superior Court

The Honorable Bruce D. Parent, Judge

Trial Court Cause No.
45D11-1803-CT-00039

---

**Opinion by Judge Felix**
Judges May and Mathias concur.

**Felix, Judge.**

## Statement of the Case

Approximately seven years after Christine and Roy Cosme (collectively, the "Cosmes") were injured in a rear-end collision caused by an uninsured driver, their automobile insurer Erie Insurance Exchange ("Erie") was held liable by a jury for refusing in bad faith to pay the Cosmes' wreck-related insurance claim. The jury awarded the Cosmes $8,125,407.61 for the uninsured driver's negligence, Erie's breach of the insurance policy, and Erie's bad faith. The trial court reduced this award to $3,625,407.61. Erie now appeals the jury's verdict and the Cosmes cross-appeal, collectively raising the following three issues for our review:

1. Whether the trial court erred by denying Erie's motion for partial summary judgment;
2. Whether the trial court abused its discretion by admitting certain evidence at trial; and
3. Whether the trial court erred by reducing the awarded damages.

We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

In August 2016, the Cosmes purchased an automobile insurance policy for their family from Erie (the "Policy") through Churilla Insurance. The Cosmes included their son Broyce Cosme on the Policy as a driver.

In February 2017, Hobart Police Department Officer Kevin Garber pulled over a vehicle in which 19-year-old Broyce was a passenger. Broyce and his friends

were arrested for possessing marijuana. Garber listed Broyce as the driver in the incident report. In late March or early April, Broyce received a letter from the Indiana Bureau of Motor Vehicles (the "BMV") "stating that [his] license was suspended because [he] failed to show proof of insurance" as the driver of the vehicle. Tr. Vol. III at 29. Broyce contacted both the BMV and Garber to sort out the mistake. Garber confirmed that Broyce was not the driver and assured Broyce that he "would fix it." *Id.* at 30. Garber did not fix it.

[5] On August 27, Erie automatically renewed the Policy. Although Erie's internal guidelines recommended an agent and an underwriter re-underwrite an insurance policy 120 days prior to renewal, that appears to not have happened for the Policy.

[6] On August 31, Churilla Insurance uploaded to Erie's system a vehicle change request for the Policy. This request automatically triggered Erie's underwriting system to pull motor vehicle records for all drivers listed on the Policy, including Broyce. Erie then discovered that Broyce's license had been suspended in early 2017. Consequently, on September 6, Megan Malena, Erie's sole underwriter for Indiana, entered a comment on the Policy regarding Broyce's license suspension and emailed Churilla Insurance about obtaining an exclusion for Broyce.

[7] On September 27, Erie sent a letter to the Cosmes (the "Exclusion Letter") stating that it would "not be able to continue [the Policy] unless [it was] permitted to exclude coverage" for Broyce. Tr. Vol. V at 77. Erie informed the

Cosmes that if it did not receive a completed version of the attached "No Coverage" form by October 28, it would cancel the Policy effective at 12:01 a.m. on November 1. *Id.* Erie stated the reason for the exclusion request was "because [its] underwriting information indicates that [Broyce's] license was suspended effective 4/26/17 and is currently suspended." *Id.*

[8] A few days later, the Cosmes received the Exclusion Letter, and Roy directed Broyce to resolve his license suspension. On October 26, Roy called Erie, which transferred him to Churilla Insurance. Roy spoke with Janine Aguilar and told her that Broyce's license had been erroneously suspended. Aguilar advised Roy to complete the "No Coverage" form, but she also told him she would "check with Erie and see what they say," Tr. Vol. II at 163. Aguilar emailed Malena, relaying Roy's account of the suspension and asking for confirmation that the Policy would not be cancelled as stated in the Exclusion Letter.

[9] On October 27, Malena responded that Broyce's record still showed the suspension; she did not address Aguilar's cancellation question. Aguilar then called Roy, directing Broyce to reinstate his license and send her proof of the reinstatement. Broyce paid to reinstate his license the same day and sent an email with the requested documentation, but he sent it to the wrong email address. On October 30—two days after the deadline for receipt of the "No Coverage" form—Aguilar told Roy she had not received Broyce's reinstatement paperwork; Broyce re-sent the email, and Aguilar confirmed she received it. Aguilar then emailed the documentation to Malena and asked Malena to

"forego or extend the cancellation" so the Cosmes would not lose insurance "because of a mistake by the BMV." Tr. Vol. V at 118. Malena had already initiated the cancellation earlier that day. On October 31, Malena responded to Aguilar's email, asserting the Policy would be reinstated only if the Cosmes agreed to exclude Broyce therefrom. Upon receiving this response, Aguilar attempted to contact both Roy and Broyce to tell them the Policy was going to be cancelled, but she could not reach them. At 12:01 a.m. on November 1, unbeknownst to the Cosmes, Erie purported to cancel the Policy.

[10] On November 4 in Hammond, Indiana, Roy was driving one of the vehicles listed on the Policy, and Christine was in the passenger seat. Debora Warfield Clark, an uninsured driver, rear-ended the Cosmes, striking their vehicle "really hard" on the rear passenger side, Tr. Vol. III at 78. The Cosmes' vehicle was damaged but drivable; Clark's vehicle was "totaled," *id.* Christine was taken to the hospital for neck pain, and she continues to suffer from neck pain years after the wreck. Roy had vision issues for a few months but has since recovered.

[11] On November 6, the Cosmes received a letter from Erie (the "Cancellation Letter") stating that on November 1, it had cancelled the Policy. Roy immediately called Aguilar to ask about the Cancellation Letter and report the wreck from two days earlier. Aguilar confirmed the cancellation. Later that same day, the Cosmes submitted the "No Coverage" form and obtained a new automobile insurance policy from Erie, effective November 7, that did not include Broyce. Soon thereafter, Broyce obtained a court order correcting his driving record to remove the erroneous suspension.

[12] Due to the wreck, the BMV sought verification of financial responsibility from Roy, but he could not provide any because Erie and Churilla Insurance maintained that the Policy was cancelled as of November 1. The BMV suspended Roy's license, but he later obtained a hardship license.

[13] Because Clark was uninsured at the time of the wreck, the Cosmes filed a claim with Erie under the Policy. On November 30, Erie denied the Cosmes' claim.

[14] In March 2018, the Cosmes sued Erie, Churilla Insurance, and Clark. Against Erie, the Cosmes brought claims of breach of contract and bad faith.[1] In July 2020, Erie filed a motion for partial summary judgment on the bad faith claim (the "Summary Judgment Motion"), which the trial court ultimately denied. In mid-2022, the case went to jury trial (the "First Trial"), which ended in a directed verdict for Erie. On whether it was proper to enter a directed verdict for Erie, the Indiana Supreme Court reversed and remanded, *Cosme v. Clark*, 232 N.E.3d 1141, 1145, 1152–54 (Ind. 2024).[2]

[15] In February 2025, the case once again went to jury trial (the "Second Trial").[3] The jury found in favor of the Cosmes and awarded them $8,125,407.61 in damages. On Erie's motion to correct error, the trial court reduced the jury's

---

[1] The Cosmes also brought a negligence claim against Erie, but it was dismissed at their request prior to the Second Trial.

[2] The First Trial ended in a directed verdict for Churilla Insurance, which the Indiana Supreme Court affirmed. *Cosme v. Clark*, 232 N.E.3d 1141, 1145, 1154–55 (Ind. 2024).

[3] The trial court granted the Cosmes' motion for default judgment as to Clark, and the Cosmes and Erie agreed to permit the jury to award damages related to Clark.

verdict to $3,625,407.61.  This appeal ensued.[4]  Additional facts will be provided as necessary.

## Discussion and Decision

### 1.  The Trial Court Did Not Err by Denying the Summary Judgment Motion

[16]  Erie contends the trial court erred by denying the Summary Judgment Motion because (a) it considered the Cosmes' allegedly untimely filed response thereto, and (b) Erie met its prima facie burden and the Cosmes did not come forward with contrary evidence showing an issue for the trier of fact.[5]  We address each contention in turn.

#### a.  Timeliness

[17]  Erie first argues that the trial court could not consider the Cosmes' responsive filings regarding the Summary Judgment Motion because they were not timely filed.  On July 2, 2020, Erie filed its motion for partial summary judgment on the Cosmes' bad faith claim.  The Cosmes did not file a response to the

---

[4] After this case was fully briefed, the Cosmes filed a motion to strike portions of Erie's reply brief or for leave to file a sur-reply thereto.  Simultaneously with this decision, we have issued an order denying that motion.

[5] The Cosmes argue Erie has waived these arguments by failing to (1) seek interlocutory appeal of the trial court's denial order, (2) raise these issues in the first appeal, and (3) raise these issues in a motion in limine or subsequent summary judgment motion before the Second Trial.  First, as the Cosmes implicitly acknowledge, the denial of the partial summary judgment motion was not a final judgment, *see* Ind. Appellate Rule 9(A)(1), or an interlocutory order that Erie could have appealed as of right, *see id.* 14(A).  Erie was within its rights to save its summary judgment arguments for appeal.  Second, it is not clear that Erie could have or should have raised its summary judgment arguments in the first appeal, particularly because it was initiated by Cosme appealing the directed verdict in favor of Erie.  Third, while Erie certainly could have tried to relitigate the summary judgment motion before the Second Trial, we will not deem Erie's summary judgment arguments waived simply because it potentially could have chosen but did not choose alternate litigation strategies.

Summary Judgment Motion within 30 days or otherwise request an extension within 30 days to do so. On August 7, the trial court granted the Summary Judgment Motion. The Cosmes then filed a motion to set aside that ruling, asserting their failure to file a response was (1) accidental and (2) they had an agreement with Erie to extend the response deadline.

[18] Importantly, when Erie filed the Summary Judgment Motion and when the Cosmes sought to set aside the trial court's ruling thereon, we were in the midst of the COVID-19 pandemic. On May 29, 2020, as part of its ongoing response to COVID-19, the Indiana Supreme Court extended trial courts' emergency tolling authority:

> The Court authorizes the tolling, **through August 14, 2020**, of all laws, rules, and procedures setting time limits for speedy trials in criminal and juvenile proceedings; public health and mental health matters; all judgments, support, and other orders; and in all other civil and criminal matters before Indiana trial courts.

*In re Admin. Rule 17 Emergency Relief for Ind. Trial Courts Relating to 2019 Novel Coronavirus (COVID-19)*, 145 N.E.3d 787, 787 (Ind. 2020) (emphasis in original).

[19] According to Erie, the "plain language" of this order shows that "it authorized the tolling of all laws setting time limits for *speedy trials* in civil and criminal matters." Appellant's Reply Br. at 17 (emphasis in original). Erie thus asks us to read the May 29 order as follows: The Court authorizes the tolling, through August 14, 2020, of all laws, rules, and procedures *setting time limits for speedy trials* (1) in criminal and juvenile proceedings; public health and mental health

matters; all judgments, support, and other orders; and (2) in all other civil and criminal matters before Indiana trial courts. *See id.* Erie's reading of the May 29 order is unreasonable and does not comport with the stated purpose of the tolling orders and this court's interpretation thereof.

[20] First, "speedy trials" are available in only criminal matters. *See* Ind. Crim. Rule 4 (effective Jan. 26, 1987, through Dec. 31, 2023); *id.* 4, 4.1, 4.2. Certain civil matters are subject to specific time limits, such as juvenile delinquency proceedings, Ind. Code § 31-37-11-2 (deadlines for holding factfinding or waiver hr'g); child in need of services proceedings, *id.* §§ 31-34-5-1 (deadline for detention hr'g), -10-2 (deadlines for initial hr'gs), -11-1 (deadline for factfinding hr'g); termination of parental rights proceedings, *id.* § 31-35-2-6 (deadlines for commencing and completing factfinding hr'g); and mental health matters, *id.* §§ 12-26-6-4 (deadline for temp. commitment hr'g), -7-4 (deadline for reg. commitment hr'g). Likewise, certain rules of procedure impose time limits, such as Indiana Trial Rule 56(C) (deadline for responding to summary judgment motion), Indiana Appellate Rule 9 (deadline for initiating appeal), and Indiana Access to Court Records Rule 6(B) (deadline for responding to ACR exclusion request). None of these time limits equate to "speedy trials."

[21] Second, on March 16, 2020, in its very first tolling order, the Indiana Supreme Court stated, "Appropriate public health responses to the COVID-19 outbreak will likely require limiting trial court operations and inhibit litigants' and courts' ability to comply with statutory deadlines and rules of procedure applicable in courts of this state." *In re Admin. Rule 17 Emergency Relief for Ind. Trial Courts*

*Relating to 2019 Novel Coronavirus (COVID-19)*, 141 N.E.3d 388, 388 (Ind. 2020). The Indiana Supreme Court clearly intended to toll *all* time limits found in rules of procedure and in statutes, including those discussed above.

[22] Third, in the years since the tolling orders, we have repeatedly held that those orders unambiguously tolled *all* laws, rules, and procedures that set time limits in all civil matters in Indiana's trial courts. *See Brugh v. Milestone Contractors, LP*, 202 N.E.3d 1091, 1097 (Ind. Ct. App.) ("[T]he COVID-19 orders were clearly meant to apply to any time limit . . . ."), *trans. denied*, 209 N.E.3d 1169 (Ind. 2023); *William F. Braun Milk Hauling, Inc. v. Malanoski*, 192 N.E.3d 213, 218 (Ind. Ct. App. 2022) (collecting authorities) (discussing tolling order's effect on statutes of limitation); *In re K.W.*, 178 N.E.3d 1199, 1204 (Ind. Ct. App. 2021) (discussing tolling orders' effect on CHINS hearing deadlines). Our interpretation of the tolling orders "is consistent with the plain language of the orders and also with the important policy considerations behind them." *Malanoski*, 192 N.E.3d at 218. We will not narrow that interpretation today.

[23] The May 29 order's tolling provision includes Trial Rule 56(C)'s 30-day time limit for a party to file a response to a summary judgment motion. *See Brugh*, 202 N.E.3d at 1097; *Malanoski*, 192 N.E.3d at 218. When a deadline is tolled, it is typically suspended until the tolling period ends. *See Malanoski*, 192 N.E.3d at 218 (collecting authorities). The May 29 order was the last of our Supreme Court's COVID-19 tolling orders, so the tolling period for all time limits covered thereby ended on August 14, 2020. *K.W.*, 178 N.E.3d at 1204. Accordingly, the Cosmes had until August 14, 2020, to file a response to the

Summary Judgment Motion or request an extension to do so. Four days before this deadline, the Cosmes filed their motion to set aside and for an extension. That filing was timely, so the trial court had the discretion to vacate its prior order, *see* Ind. Trial Rule 59, 60(B), and grant the extension, *id.* 56(I).

### b. Merits

[24] Erie next argues that it was entitled to summary judgment on the Cosmes' bad faith claim. We review summary judgment decisions de novo, *Gierek v. Anonymous 1*, 250 N.E.3d 378, 384 (Ind. 2025) (citing *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014)), which means we apply the same standard as the trial court, *Wohlt v. Wohlt*, 245 N.E.3d 611, 615 (Ind. 2024) (citing *Red Lobster Rests. LLC v. Fricke*, 234 N.E.3d 159, 165 (Ind. 2024)). Summary judgment is proper only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R. 56(C). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Abbott v. State*, 183 N.E.3d 1074, 1079 (Ind. 2022) (quoting *Hughley*, 15 N.E.3d at 1003).

[25] We resolve "[a]ll factual inferences and all doubts as to the existence of a material issue" in favor of the nonmovant. *Zaragoza v. Wexford of Ind., LLC*, 225 N.E.3d 146, 151 (Ind. 2024) (internal quotation marks omitted) (quoting *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012)). In so doing, "we give careful scrutiny

to make sure the non-movant's day in court is not improperly denied." *Id.* (internal quotation marks omitted) (quoting *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016)).

[26] "The party moving for summary judgment bears the burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Abbott*, 183 N.E.3d at 1079 (emphasis in original) (citing *Sargent v. State*, 27 N.E.3d 729, 731 (Ind. 2015)). The movant "can make this showing when undisputed evidence affirmatively negates a required element" of the nonmovant's claim. *Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 377 (Ind. 2022) (citing *Siner*, 51 N.E.3d at 1187–88). Only if the movant meets this prima facie burden does the burden then shift to the nonmovant to "come forward with contrary evidence showing an issue for the trier of fact." *Abbott*, 183 N.E.3d at 1079 (citing *Hughley*, 15 N.E.3d at 1003).

[27] Here, Erie filed a motion for and was denied summary judgment on the Cosmes' bad faith claim. Our Supreme Court has explained an insurance-based bad faith claim as follows:

> In recognition of an insurer's "special relationship" with its insured, Indiana imposes on insurers an implied duty of good faith and fair dealing. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). Any breach of this legal duty, which we imply "in all insurance contracts", exposes the insurer to compensatory damages, like any other breach of contract. *Id.* at 518–19. But an insurer that goes further and acts in bad faith toward its insured may be liable for punitive damages. *Id.* at 520. Though

> punitive damages are prohibited "in a breach of contract action",
> a bad-faith claim is "an independent tort for the breach of the
> insurer's obligation to exercise good faith . . . upon which
> punitive damages may be based." *Ibid.*

*Baldwin v. Standard Fire Ins. Co.*, 269 N.E.3d 1197, 1204 (Ind. 2025).

[28] To succeed on an insurance-based bad faith claim, the claimant must first prove the insurer breached the duty of good faith and fair dealing. *Baldwin*, 269 N.E.3d at 1209 (citing *Hickman*, 622 N.E.2d at 520). That duty "requires the insurer 'to refrain from' certain behavior," including (1) "making an unfounded refusal to pay policy proceeds," (2) "causing an unfounded delay in making payment," (3) "deceiving the insured," and (4) "exercising any unfair advantage to pressure an insured into a settlement of his claim." *Id.* at 1207 (quoting *Hickman*, 622 N.E.2d at 519); *see also Cosme*, 232 N.E.3d at 1153 (citing *Monroe Guar. Ins. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005)). If the claimant succeeds on this underlying claim, he then has the burden of proving by clear and convincing evidence that the insurer "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Hickman*, 622 N.E.2d at 520 (quoting *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137–38 (Ind. 1988)). Provided the claimant proves both a breach of the duty of good faith and fair dealing as well as bad faith, the jury may award the claimant punitive damages "in the sum [it believes] will serve to punish the [insurer] and to deter it and others from like conduct in the future." *Id.* (quoting *Robertson*, 519 N.E.2d at 137–38).

In seeking summary judgment, Erie asserted that (i) it did not breach the duty of good faith and fair dealing as a matter of law, (ii) it complied with Indiana statute in cancelling the Policy, and (iii) it did not act in bad faith. We address each argument in turn.

### i. Duty of Good Faith & Fair Dealing

Erie first argues that as a matter of law, it did not breach the duty of good faith and fair dealing. The Cosmes sued Erie based on Erie's denial of the Cosmes' claim under the Policy. Erie frames the Cosmes' bad faith claim as one pertaining to "underwriting actions." Appellant's App. Vol. II at 89. According to Erie, because "underwriting actions" is not one of the four categories of behavior described above, *see supra* ¶ [28], the Cosmes' claim fails as a matter of law. In response, the Cosmes assert that Erie's underwriting actions fall within two of the four enumerated categories: (1) Erie has refused to pay proceeds under the Policy based on its underwriting actions, thereby making that refusal unfounded, and (3) Erie deceived the Cosmes in performing the underwriting actions. We agree with the Cosmes that as a matter of law, the "underwriting actions" may fall within at least one of the four categories our Supreme Court has delineated for the duty of good faith and fair dealing, *see supra* ¶ [28], or the "underwriting actions" may otherwise fall within the scope of that duty, *see Magwerks*, 829 N.E.2d at 976 (declining to expand extent of duty but addressing bad faith claim premised on denial of coverage). Accordingly, Erie is not entitled to judgment as a matter of law on this basis.

## ii. Compliance with Indiana Law

[31] Erie next contends that it did not breach the duty of good faith and fair dealing because its cancellation of the Policy complied with Indiana Code section 27-7-6-4. That statute provides in relevant part as follows:

> A notice of cancellation by an insurer of an automobile insurance policy as defined in this chapter shall be effective only if such cancellation is for one (1) or more of the following reasons:
>
> * * *
>
> (b) The driver's license or motor vehicle registration of the named insured or of any other operator who either resides in the same household or customarily operates an automobile insured under the policy has been denied or has been under suspension or revocation during the policy period or the existence of one (1) or more grounds for such denial, suspension, or revocation has become known.

I.C. § 27-7-6-4.

[32] Erie's designated evidence shows that Broyce customarily operated an automobile insured under the Policy; in early 2017, Broyce's license was suspended; on September 27, 2017, Erie sent the Exclusion Letter; and on November 1, 2017, Erie cancelled the Policy because the Cosmes had not agreed to exclude Broyce therefrom. However, Erie's designated evidence also shows that on April 3, 2018, Erie's "Property & Casualty Records Coordinator" certified that the Policy was in effect "from August 27, 2017, to August 27,

2018."[6] Appellant's App. Vol. II at 93. The Coordinator attached to her notarized certification a copy of the Policy's Declarations, which indicated on all three pages that the "Policy Period" was "08/27/2017 to 08/27/2018." *Id.* at 94–96. This certification and the Declarations directly conflict with a letter dated November 30, 2017, that Erie sent to the Cosmes stating the Policy "was canceled on November 1, 2017 and was later rewritten under a different policy number effective November 7, 2017." *Id.* at 152. Erie's designated evidence therefore demonstrates a genuine issue of material fact exists as to whether the Policy was even cancelled.

[33] Assuming arguendo that Erie met its prima facie burden such that the burden shifted to the Cosmes, the Cosmes satisfied their burden of demonstrating a genuine issue of material fact exists. The Cosmes rely on Indiana Code section 27-7-6-5, which governs the efficacy of insurance cancellation notices. Under that statute, a notice of cancellation issued pursuant to Indiana Code section 27-7-6-4(b) "is not effective . . . unless it is mailed by the insurer to the named insured at least twenty (20) days prior to the effective date of cancellation." I.C. § 27-7-6-5(a)(1). The Cosmes' designated evidence shows that Erie did not consider the Exclusion Letter a notice of cancellation but instead a "driver

---

[6] In its summary judgment reply brief, Erie asserted that this certification contained "a scrivener's error." Appellant's App. Vol. III at 135 (citing *id.* at 143). In an undated affidavit submitted with that brief, the Coordinator stated that her "certification should have said, 'I hereby certify that from August 27, 2017 to November 1, 2017 the enclosed Declarations, policy form and endorsements were in effect under ERIE Policy Number Q08-2715138 unless otherwise modified or cancelled." *Id.* at 143. However, and importantly, neither Erie nor the Coordinator claimed that the *Declarations* attached to the certification included incorrect "Policy Period" information. *See id.* at 135, 143.

exclusion request," Appellant's App. Vol. III at 70; *see also id.* at 73, which had been created from an "exclusion form," *id.* at 72, 73. Therefore, the Cosmes established a genuine issue of material fact existed concerning whether the Exclusion Letter was a notice of cancellation and thus whether Erie complied with Indiana law in cancelling the Policy. Based on the foregoing, Erie is not entitled to summary judgment based on its alleged compliance with Indiana law in cancelling the Policy.

### iii. Bad Faith

[34] Finally, Erie argues that because the Cosmes cannot sustain a claim for breach of the duty of good faith and fair dealing, their bad faith claim must also fail. This argument is premised on Erie negating the Cosmes' breach of duty claim. As discussed above, Erie failed to do so. Without additional argument on the merits of the Cosmes' bad faith claim, Erie is not entitled to summary judgment thereon.

### c. *Summary*

[35] The Cosmes' motion to set aside the order granting the Summary Judgment Motion and for an extension of time to file their response thereto was not untimely. The Cosmes' responsive briefing was therefore properly before the trial court. Erie did not meet its prima facie burden of showing it is entitled to judgment as a matter of law and there are no genuine issues of material fact regarding the Cosmes' bad faith claim. Consequently, the trial court did not err by denying the Summary Judgment Motion.

## 2. The Trial Court Did Not Abuse Its Discretion by Admitting Certain Evidence at the Second Trial

[36] Erie claims that the trial court abused its discretion at the Second Trial by admitting testimony from the Cosmes' insurance expert Elliot Flood characterizing Erie's actions as "opportunistic fraud."[7] Appellant's Br. at 38. Flood opined that Erie failed to properly investigate the Cosmes' claim, denied the claim knowing it did not properly investigate it, made an unfounded refusal to pay proceeds from the Policy, and deceived the Cosmes. Flood then opined about the intentionality of Erie's actions:

> Q. Is it your opinion that all of this was intentional conduct?
>
> A. It was a form of what I would call opportunistic fraud. It started out as sort of a bungling. It created a situation that when a claim arose, they could opportunistically take advantage of it.
>
> [N]ot all fraud is planned from the beginning. But some of it occurs on a spur of the moment. [W]hat happens is you have this bungling attempt to get B[r]oyce removed from the policy. The insured are doing everything that they're being asked to do by Erie and then it gets cleared up. It's documented that he never should have lost his license and we had a court order that in that scenario with that kind of stuff going on, and along comes a claim. No investigation. . . . We're going to say we canceled.

---

[7] In this section of its Argument, Erie fails to cite "to the pages of the Transcript where the [challenged] evidence was identified, offered, and received," as required by Indiana Appellate Rule 46(A)(8)(d). *See also* App. R. 46(A)(8)(a). We remind counsel that the purpose of our appellate rules—especially Appellate Rule 46 governing the content of briefs—"is to aid and expedite review and *to relieve the appellate court of the burden of searching the record* and briefing the case." *Miller v. Patel*, 212 N.E.3d 657, 657 (Ind. 2023) (emphasis added) (quoting *Dridi v. Cole Kline LLC*, 172 N.E.3d 361, 364 (Ind. Ct. App. 2021)).

That's the taking opportunity of an unfortunate event to get out of a $250,000 in insurance.

Q. So, it sounds like you're making a connection between the fact that there's an attempt to deny a certification and a declaration page and a corporate record under oath and it just so happens that that would result in them not having to pay a claim of Ms. Cosme?

A. Right. And I guess what I'm trying to distinguish between is mistakes do happen, things get bun[g]led. Those are not necessarily fraudulent.

But, when you have - we call it opportunistic fraud. What happens is, when a situation arises that gives you the opportunity to take advantage of something that's happened and you do that knowing there's no cancelation, knowing that they straightened it out, knowing that they did everything that you wanted them to do. Then, you're making a misrepresentation, which is fraudulent, saying your policy was canceled. And that's a misrepresentation and they even repeated it in a so-called affidavit two years later.

Tr. Vol. III at 210–11.

[37]    Erie objected "to this line of questioning on the grounds that this is beyond the original deposition transcript, it's beyond his original report. Under the trial rules, they – counsel has the duty to supplement any opinions that changed. And this is now brand new stuff and it's not disclosed." Tr. Vol. III at 212. The Cosmes responded that Flood's testimony "was discussed in previous testimony," they "covered what was in there before," and they were "done with this line of questioning." *Id.* The trial judge indicated that he "wasn't here

before so [he did not] know what the previous" testimony had been. *Id.* The Cosmes then said they were "moving on to another line of questioning," and the trial court stated, "All right." *Id.* The Cosmes immediately resumed questioning Flood. *Id.* Thus, the trial court implicitly overruled Erie's objection.

[38] We review rulings on admissibility of evidence for an abuse of discretion. *Russell v. State*, 234 N.E.3d 829, 858 (Ind. 2024) (quoting *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012)), *cert. denied*, 145 S. Ct. 424 (2024). "[W]e may affirm the trial court's decision on any basis supported by the record," *Means v. State*, 201 N.E.3d 1158, 1163 (Ind. 2023) (citing *Ramirez v. State*, 174 N.E.3d 181, 190 n.2 (Ind. 2021)), and we will reverse "only where the decision is clearly against the logic and effect of the facts and circumstances," *Russell*, 234 N.E.3d at 858 (quoting *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001)).

[39] Erie specifically contends the trial court abused its discretion by admitting Flood's "opportunistic fraud" testimony because it "was a new opinion that should have been disclosed prior to trial."[8] Appellant's Br. at 38. According to

---

[8] Erie further argues that "Flood was precluded from testifying" at the Second Trial about his opinion that "Erie had 'acted recklessly and/or grossly negligently, and breached its duty to deal in good faith and fair dealing.'" Appellant's Reply Br. at 18. Before the First Trial, the trial court ordered that "Flood may not testify about any legal conclusion regarding Churilla's or Erie's conduct, including testimony as to whether or not any conduct was unreasonable, negligent, grossly negligent or reckless." Appellant's Supp. App. Vol. II at 47. Prior to the Second Trial, the trial court indicated it would "try to . . . maintain" the motions in limine in place for the First Trial. Tr. Vol. II at 9. At the Second Trial, Erie did not object to the challenged testimony based on the trial court's prior order. Erie has thus waived its argument based thereon. *See Halliburton v. State*, 1 N.E.3d 670, 678–79 (Ind. 2013) (citing *Treadway v. State*, 924 N.E.2d 621, 633 (Ind. 2010)) ("Failure to object at trial waives the issue for review . . . ."); *Bradley v. State*, 248 N.E.3d 563, 573 (Ind. 2024) (Todisco v. State, 965 N.E.2d 753, 756 (Ind. Ct. App. 2012)) ("[T]o 'properly preserve an issue

Erie, the Cosmes "failed to supplement Flood's opinions prior to trial," which "prevented Erie from adequately preparing an effective cross-examination of Flood." *Id.* at 39. Trial Rule 26(E) imposes a continuing duty to supplement discovery responses if, under the circumstances, "a failure to amend the response is in substance a knowing concealment." T.R. 26(E)(2)(b) (effective Jan. 1, 2013, to Dec. 31, 2025);[9] *see also Outback Steakhouse of Florida, Inc. v. Markley*, 856 N.E.2d 65, 78 (Ind. 2006) (clarifying the duty to supplement discovery continues during trial). "If a party fails to comply with Trial Rule 26(E) by not supplementing discovery responses, the trial court may, in its discretion, exclude the testimony of a witness." *O'Banion v. Ford Motor Co.*, 43 N.E.3d 635, 645 (Ind. Ct. App. 2015) (citing *Everage v. N. Ind. Pub. Serv. Co.*, 825 N.E.2d 941, 951 (Ind. Ct. App. 2005)), *trans. denied*.

[40] The Cosmes argue that they did not conceal Flood's opinions, as demonstrated by two of Erie's filings in this case—a 2020 motion to strike and a 2022 motion to exclude Flood's testimony from the First Trial.[10] First, in litigating the Summary Judgment Motion, the Cosmes designated an affidavit from Flood. In his affidavit, Flood opined that Erie "failed to follow accepted industry

---

for appellate review,' [a litigant] 'must state with reasonable specificity the grounds for his objection while before the trial court.'").

[9] This requirement is unchanged in the current version of Trial Rule 26(E)(2)(b).

[10] Erie filed a supplemental appendix that includes the 2022 motion and related filings. However, neither party provided us with the 2020 motion to strike and associated filings, so pursuant to Appellate Rule 27 and Indiana Evidence Rule 201, we have taken judicial notice thereof. *See Horton v. State*, 51 N.E.3d 1154, 1156 (Ind. 2016) (taking judicial notice under Evidence Rule 201 of documents that were part of the Record on Appeal as defined in Appellate Rule 27).

standards, acted recklessly and/or grossly negligently, and breached its duty to deal in good faith." Appellant's App. Vol. III at 129. Flood also opined that Erie had engaged in "post[-]claim underwriting," which was "a red flag . . . that the company has not been forthright and is attempting to justify prior poor practices." *Id.* at 131. On November 6, 2020, Erie filed a motion to strike Flood's affidavit because it provided an opinion on the ultimate issue of whether Erie breached the duty of good faith and fair dealing, *see* Ind. Evidence Rule 704(b), and it would not be helpful to the trier of fact, *see id.* 702(a). Second, on March 4, 2022, in anticipation of the First Trial, Erie filed a motion to exclude Flood's testimony for the same reasons it sought to strike his affidavit at the summary judgment stage.

[41]     As demonstrated by the foregoing, Erie was aware that Flood was of the opinion that Erie had "not been forthright" and had "attempt[ed] to justify its prior poor practices." Appellant's App. Vol. III at 131. Nevertheless, Erie contends that Flood's testimony at the Second Trial was "novel" because "[a]t no time, either in Flood's affidavit or in his testimony during the [F]irst [T]rial, were the words 'opportunistic fraud' mentioned or uttered." Appellant's Reply Br. at 18.

[42]     In support, Erie cites to this court's decision in *Nature's Link, Inc. v. Przybyla*, 885 N.E.2d 709 (Ind. Ct. App. 2008). There, Thomas Przybyla sued a snow plowing company for back injuries he sustained in a wreck with one of the company's snowplows. *Id.* at 711–12. The company hired Dr. Arthur Lorber as its expert physician. *Id.* at 712. Przybyla deposed Dr. Lorber "less than two

weeks prior to trial," and during that deposition, "Dr. Lorber assured that his revised report contained all of his opinions concerning Przybyla's medical condition." *Id.* at 717. Prior to trial, Dr. Lorber opined that Przybyla's back pain was largely the result of prior collisions and a fall. *Id.* At trial, Dr. Lorber testified for the first time that Przybyla suffered from a genetic disease affecting his spine, a diagnosis he reached "a few days prior to trial, after his deposition." *Id.* Przybyla sought a new trial under Trial Rule 60(B)(3) and presented an affidavit from his expert about how he would have responded to the new diagnosis. *Id.* at 718. This court determined that the injection of Dr. Lorber's new, previously undisclosed medical opinion at trial denied Przybyla the opportunity to investigate and respond thereto. *Id.* Consequently, this court affirmed the trial court's decision to order a new trial. *Id.* at 719.

[43] The facts of *Przybyla* are distinct from the facts here. While it may be true that Flood did not previously use the phrase "opportunistic fraud," that terminology does not change the substance of his opinion as articulated in his summary judgment affidavit. *Compare* Tr. Vol. III at 210–11, *with* Appellant's App. Vol. III at 129–31. Erie was well aware that Flood would likely testify that it had "not been forthright" and had "attempt[ed] to justify [its] prior poor practices." Appellant's App. Vol. III at 131. A simple change in phrasing does not render that opinion "new" or "novel."

[44] Based on the foregoing, we cannot say that Flood's challenged testimony represented a new, previously undisclosed opinion. The trial court therefore did not abuse its discretion by admitting that testimony at the Second Trial.

### 3. The Trial Court Erred in Part by Reducing the Jury's Verdict

[45] Both Erie and the Cosmes challenge the jury's verdict as modified by the trial court. The jury awarded the Cosmes four types of damages: (1) $2 million "as a result of the negligence of Defendant Debora A. Warfield Clark" (the "Wreck Damages"), Appellant's App. Vol. II at 51; (2) $3 million "as a result of the breach of contract by Erie Insurance Exchange" (the "Breach of Policy Damages"), *id.*; (3) $3 million for Erie's breach of "its duty of good faith and fair dealing" (the "Breach of Duty Damages"), *id.* at 52, and (4) $125,407.61 in punitive damages (the "Punitive Damages").

| Wreck Damages | $ 2,000,000.00 |
|---|---|
| Breach of Policy Damages | $ 3,000,000.00 |
| Breach of Duty Damages | $ 3,000,000.00 |
| Punitive Damages | $ 125,407.61 |
| **TOTAL** | **$ 8,125,407.61** |

*See* Appellant's App. Vol. II at 49, 51–54; Tr. Vol. IV at 158–59.

[46] After trial, Erie filed a Trial Rule 59 motion to correct error, arguing the jury's verdict was excessive. Erie specifically argued in relevant part that its contractual liability could not exceed $500,000 under the Policy. The trial court determined that the Wreck and Breach of Policy Damages were "super[s]eded" by the Policy and the Breach of Duty and Punitive Damages were not excessive. Appellant's App. Vol. II at 46. The trial court therefore reduced the Wreck and Breach of Policy Damages to $500,000 total, resulting in the following revised award:

|                          | Original |              | Revised |              |
| ------------------------ | -------- | ------------ | ------- | ------------ |
| Wreck Damages            | $        | 2,000,000.00 | $       | 500,000.00   |
| Breach of Policy Damages | $        | 3,000,000.00 |         |              |
| Breach of Duty Damages   | $        | 3,000,000.00 | $       | 3,000,000.00 |
| Punitive Damages         | $        | 125,407.61   | $       | 125,407.61   |
| **TOTAL**                | **$**    | **8,125,407.61** | **$** | **3,625,407.61** |

*See* Appellant's App. Vol. II at 46.

[48]  Before reaching the parties' arguments, we must first address an apparent misunderstanding regarding the Wreck and Breach of Policy Damages. The trial court and parties characterize the Wreck Damages as breach-of-contract compensatory damages and the Breach of Policy Damages as breach-of-contract consequential damages. We cannot agree with these descriptions.

[49]  Damages are "the sum recoverable as amends for the wrong." *Erie Ins. Exch. v. Craighead*, 192 N.E.3d 195, 203 (Ind. Ct. App. 2022) (emphasis omitted) (quoting *City of N. Venon v. Voegler*, 103 Ind. 314, 319, 2 N.E. 821, 824 (1885)), *trans. denied*. The Wreck Damages were for Clark's negligence, and the Breach of Policy Damages were for Erie's breach of the Policy. Negligence and breach of contract are separate and distinct theories of liability. To succeed on a negligence claim, "the plaintiff must prove (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached its duty . . . , and (3) [the plaintiff suffered] a compensable injury proximately caused by the defendant's breach of duty." *Abbas v. Neter-Nu*, 261 N.E.3d 233, 243 (Ind. 2025) (citing *Methodist Hosps., Inc. v. Johnson*, 856 N.E.2d 718, 720–21 (Ind. Ct. App. 2006)). To succeed on a breach of contract claim, the plaintiff must prove (1) a contract

existed, (2) the defendant breached that contract, and (3) damages. *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (*Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993)). As demonstrated by their disparate elements, negligence and breach of contract are two different wrongs. *See also Hickman*, 622 N.E.2d at 519 (explaining general differences between tort and contract damages).

[50] Moreover, prior to the Second Trial, the parties agreed that Clark was liable for the wreck, so the Cosmes made an unopposed motion for default judgment on their negligence claim against Clark, which the trial court granted. The parties "agreed to permit the jury to award damages related to" Clark. Tr. Vol. II at 10–11. In accordance with that agreement, the parties stipulated to a verdict form that included Clark's liability under the Cosmes' breach of contract claim:

**I: BREACH OF CONTRACT**

**(Fill out and sign only Verdict Form "A" or "B")**

A. **Verdict Form A – Verdict for Roy and Christine Cosme**

We, the jury, find that Defendant Erie Insurance Exchange breached its insurance contract with Plaintiffs Christine Cosme and Roy Cosme and, therefore, award the following damages to Roy and Christine Cosme, as follows:

We, the jury award the following damages to Roy and Christine Cosme as a result of the negligence of Defendant Debora A .Warfield Clark: $ 2 million .

We, the jury award the following additional damages to Roy and Christine Cosme as a result of the breach of contract by Erie Insurance Exchange:

$3 million .

Appellant's App. Vol. II at 51. The parties understood that the Cosmes'
negligence claim against Clark was separate and distinct from their breach of
contract claim against Erie. It appears the damages for the two claims were
listed on the same verdict form for convenience. Based on well-established law
and the parties' demonstrated understanding of the Cosmes' claims in this case,
the Wreck Damages are negligence damages and the Breach of Policy Damages
are breach of contract damages.

[51] Turning now to the merits, the Cosmes' cross-appeal challenge is dispositive:
Whether the trial court erred by reducing the Wreck and Breach of Policy
Damages pursuant to the Policy. The trial court reduced those damages awards
based on the Policy's Uninsured/Underinsured Motorists Coverage
Endorsement (the "UM/UIM Coverage"). The UM/UIM Coverage provides
in relevant part as follows:

> **OUR PROMISE**
>
> "**We**" will pay damages for bodily injury and property damage
> that the law entitles "**anyone we protect**" or the legal
> representative of "**anyone we protect**" to recover from the owner
> or operator of an "**uninsured motor vehicle**" or "**underinsured
> motor vehicle**."
>
> Damages must result from a motor vehicle accident arising out of
> the ownership or use of the "**uninsured motor vehicle**" or
> "**underinsured motor vehicle**" as a **motor vehicle** and involve:

1.  bodily injury to "**anyone we protect**."  Bodily injury means physical harm, sickness, disease or resultant death to a person; or

2.  *when purchased* - property damage, meaning destruction of or injury to:

    a.  an "**owned auto we insure**" and property owned by "**anyone we protect**" while contained in such auto; and

    b.  property owned by "**you**" or a "**relative**" while contained in any "**auto we insure**" under this coverage.

 \* \* \*

**LIMITS OF PROTECTION**

**Limitations of Payment**

 . . . The "per person" limit for Bodily Injury for one "**auto**" is the most "**we**" will pay for damages arising out of bodily injury or death to one person in any one accident.  The "per accident" limit for Bodily Injury for one "**auto**" is the most "**we**" will pay for damages arising out of bodily injury or death to all persons resulting from any one accident, subject to the "per person" limit. The "per accident" limit for Property Damages is the most "**we**" will pay for all property damage caused by any one accident.

 \* \* \*

"**We**" will pay no more than the Uninsured/Underinsured Motorists Coverage limits shown on the "**Declarations**" for the "**auto**" involved in the accident, regardless of the number of

persons "**we**" protect, "**autos we insure**," premiums paid, claims made or "**autos**" involved in the accident.

Tr. Vol. V at 42–43 (emphases in original). For bodily injury, the UM/UIM Coverage was limited to $250,000 per person and $500,000 per accident; for property damage, the UM/UIM Coverage was limited to $25,000 per accident with a $300 deductible.

[52] In reducing the Wreck and Breach of Policy Damages, the trial court determined that the Cosmes "held auto and vehicle insurance with ERIE at the time of the collision," Appellant's App. Vol. II at 40; the UM/UIM Coverage limitations were "unambiguous" and "must be enforced," *id.* at 45; and those limitations "permitted the [Cosmes] to recover no more than $500,000.00 per accident in compensatory and consequential damages from ERIE," *id.* Accordingly, the trial court modified the Wreck and Breach of Policy Damages to a total of $500,000.00.

[53] The Cosmes argue the trial court should not have applied the UM/UIM Coverage limits to (a) the Wreck Damages, and (b) the Breach of Policy Damages. We address each damages award in turn.

### a. The Wreck Damages

[54] The Cosmes specifically contend Erie waived application of the UM/UIM Coverage limits to the Wreck Damages because it agreed to Final Instruction 28 and because it did not argue those limits applied until its motion to correct error. First, Final Instruction 28 states, "Roy and Christine Cosme's

compensatory damages in this case are not restricted by or limited to the Erie policy limits. Roy and Christine Cosme may recover compensatory damages, punitive damages, or both, in an amount over and above any policy limits set out in the Erie policy." Appellant's App. Vol. III at 184. When read together with all the other final instructions, Final Instruction 28 was clearly aimed at the bad faith claim, *not* the breach of contract claim. The final instructions immediately preceding and following Final Instruction 28 addressed punitive damages and the duty of good faith and fair dealing, both of which are components of only the bad faith claim. By contrast, Final Instructions 7, 9, and 10 addressed the damages the jury could award for the breach of contract claim.[11] And in discussing the final instructions, the parties agreed that the breach of contract damages may be limited by the Policy. We therefore cannot agree with the Cosmes that Final Instruction 28 "is specifically aimed at the compensatory damages flowing from the accident," Appellee's Br. at 43 n.8. The fact that Erie agreed to Final Instruction 28 does not vitiate its ability to seek a reduction of the breach of contract damages based on the UM/UIM Coverage limitations.

[55] Second, Trial Rule 59(A)(2) expressly allows a party to challenge a damages award as excessive after the verdict. That is precisely what Erie did here—once

_____

[11] Final Instruction 7 defined "breach of contract" and listed the elements the Cosmes had to prove to recover damages. Appellant's App. Vol. III at 163. Final Instruction 9 set forth factors the jury could consider in awarding damages if it determined "Erie [was] liable to the Cosmes for Breach of Contract." *Id.* at 165. Final Instruction 10 defined "consequential damages" and informed the jury they could award such damages if it determined Erie breached the Policy. *Id.* at 166.

the jury determined that the Policy was in effect when the wreck occurred and awarded damages on the negligence claim, Erie filed a motion to correct error alleging those damages were excessive. Furthermore, the interpretation of a contract is a question of law. *Illinois Cas. Co. v. B&S of Fort Wayne Inc.*, 235 N.E.3d 827, 832 (Ind. 2024) (citing *Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 206 (Ind. 2022)). Erie challenged the Wreck Damages as excessive under the terms of the UM/UIM Coverage, that is, as excessive as a matter of law. This was a question for the trial court, not the jury. Accordingly, Erie did not waive its ability to seek reduction of the Wreck Damages by failing to address at trial the UM/UIM Coverage limits.

[56] Importantly, the Cosmes do not challenge (1) the jury's or trial court's conclusion that the Policy was in effect at the time of the wreck, and (2) the trial court's conclusion that the UM/UIM Coverage limits apply to the Wreck Damages. We therefore cannot say the trial court erred by enforcing the UM/UIM Coverage limits and reducing the Wreck Damages to comport therewith.

### b. The Breach of Policy Damages

[57] The Cosmes argue that the trial court should not have reduced the Breach of Policy Damages because the UM/UIM Coverage limits do not apply thereto. Contract interpretation is a question of law we review de novo. *B&S of Fort Wayne*, 235 N.E.3d at 832 (citing *Lake Imaging*, 182 N.E.3d at 206).

[58] First, looking to the Policy itself, the plain language of the UM/UIM Coverage shows that the limits apply to only damages *resulting from a motor vehicle accident* arising out of the ownership or use of an uninsured or underinsured motor vehicle. Tr. Vol. V at 43. The jury awarded the Breach of Policy Damages as damages *resulting from Erie's breach of the Policy*. Appellant's App. Vol. II at 51. Because the Breach of Policy Damages did not result from a motor vehicle accident but instead resulted from Erie's breach of the Policy, the UM/UIM Coverage limits do not apply to the Breach of Policy Damages.

[59] Second, this court has previously held that an insurance contract's policy limits do not restrict "the damages that are recoverable for [the insurer's] breach" of that contract. *Ind. Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1090 (Ind. Ct. App. 1992) (quoting *Burleson v. Ill. Farmers Ins. Co.*, 725 F. Supp. 1489, 1496 (S.D. Ind. 1989)). When a vehicle owner contracts for insurance on his vehicle, he has the expectation of prompt payment so that he can repair or obtain a new vehicle and continue on with his life after the occurrence of a catastrophe such as the wreck in this case. *See id.* at 1092. Delayed payment, whether as a result of good or bad faith, will undoubtedly result in serious consequences to the vehicle owner. *See id.* And the vehicle owner's damages flow directly from and are proximately caused by the insurer's failure to pay. *See id.* "The likelihood of such damages is only unforeseeable to unreasonably narrow-minded insurers." *Id.* (citing *Burleson*, 725 F. Supp. at 1496; *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73 (W. Va. 1986), *holding modified by Miller v. Fluharty*, 500 S.E.2d 310 (W. Va. 1997)).

[60] The Breach of Policy Damages compensate the Cosmes for the damages caused by Erie's failure to pay their wreck-related insurance claim. Accordingly, the UM/UIM Coverage limits do not apply to the Breach of Policy Damages. The trial court thus erred by reducing the Breach of Policy Damages in accordance with those limits.

### c. Next Steps

[61] Because there was a misunderstanding regarding the nature of the Wreck and Breach of Policy Damages, and because the trial court erred by reducing the Breach of Policy Damages pursuant to the UM/UIM Coverage, we cannot reach Erie's claim that the entire damages award in this case, even as modified, is excessive. It is unclear whether the trial court analyzed the Wreck Damages under applicable negligence damages law. *See, e.g.*, *Gomez v. Cochrane*, 233 N.E.3d 409, 415 (Ind. Ct. App. 2024), *trans. not sought*. It is unclear whether the trial court would have reduced the Breach of Policy Damages but for its misunderstanding that they were solely breach-of-contract consequential damages and its misapplication of the UM/UIM Coverage limits thereto. *See, e.g.*, *Derr Enters., LLC v. Union City Ind. Props., LLC*, 253 N.E.3d 1129, 1135 (Ind. Ct. App. 2025), *trans. not sought*. And it is unclear whether the trial court chose not to reduce the Breach of Duty and Punitive Damages based on its reduction of the Breach of Policy Damages, or if it chose not to reduce those awards for some other reason. *See Hickman*, 622 N.E.2d at 519. Given the "great deference" we show to jury awards, *Sims v. Pappas*, 73 N.E.3d 700, 709 (Ind. 2017) (citing *Raess v. Doescher*, 883 N.E.2d 790, 795 (Ind. 2008)), and the

deference typically accorded to a trial court in determining whether a particular jury award is excessive, *id.*, 73 N.E.3d 705 (quoting *Santelli v. Rahmatullah*, 993 N.E.2d 167, 173 (Ind. 2013)), we choose to allow the trial court to rule on the alleged excessiveness of the Wreck Damages as modified, the Breach of Policy Damages, the Breach of Duty Damages, and the Punitive Damages before we express any opinion on the merits of Erie's excessiveness claim.

## Conclusion

In sum, the trial court did not err by denying the Summary Judgment Motion, the trial court did not abuse its discretion by admitting Flood's testimony at the Second Trial, and the trial court erred by reducing the Breach of Policy Damages pursuant to the UM/UIM Coverage. We affirm the trial court's denial of summary judgment, admission of evidence, and reduction of the Wreck Damages. We reverse the trial court's reduction of the Breach of Policy Damages and remand with instructions for the trial court to consider whether the Wreck Damages as modified, the Breach of Policy Damages, the Breach of Duty Damages, and the Punitive Damages are excessive.

Affirmed in part, reversed in part, and remanded.

May, J., and Mathias, J., concur.

ATTORNEYS FOR APPELLANT/CROSS-APPELLEE
Dina M. Cox
Charles R. Whybrew

Lewis Wagner & Trimble
Indianapolis, Indiana


James P. Strenski
Tyler L. Jones
Drewry Simmons Vornehm, LLP
Carmel, Indiana


ATTORNEYS FOR APPELLEES/CROSS-APPELLANTS

Angela M. Jones
Pillar Jones, LLC
Crown Point, Indiana


Steven J. Sersic
Smith Sersic, LLC
Munster, Indiana